IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATHAN R., | ) |
| Plaintiff, | ) ) ) |
| | ) No. 18 C 1375 |
| v. | ) |
| | ) Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner of Social Security,[1] | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Nathan R.[3] ("Plaintiff") has moved for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for Supplemental Security Income ("SSI"). (D.E. 16: Pl.'s Mot.

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On March 20, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to Magistrate Judge Finnegan for all proceedings, including entry of final judgment. (D.E. 10). On May 31, 2019, by executive committee order, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 30).

[3] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name, thereby suppressing his last name, in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants' names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

for Sum. J. and Mem. in Support of Sum. J.) The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (D.E. 24: Def.'s Mem. in Support of Sum. J.), and claimant has filed a reply. (D.E. 26.) For the following reasons, Plaintiff's motion for remand is granted and the Commissioner's motion is denied.

## I. Background

Plaintiff filed for SSI on May 29, 2015, claiming an onset date of May 19, 2015. (R. 71.) In his application for benefits, Plaintiff claimed he suffered from right eye vision loss, cataract due to severe asthma, and allergies. (*Id.*) After his claims were denied initially on October 16, 2015 and on reconsideration on January 10, 2016, Plaintiff participated in a hearing before an Administrative Law Judge ("ALJ") on March 15, 2017. (R.79, 90.) On April 11, 2017, the ALJ denied benefits and the Appeals Council affirmed the denial on February 1, 2018, making it the final opinion of the Commissioner. (R. 4-6, 21-31.) *See* 20 C.F.R. § 404.981; *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

### A.   Medical Evidence[4]

Plaintiff had surgery in 2009 to repair cataracts in both eyes; the cataracts were likely a result of long-term use of steroid medication for his asthma, which was diagnosed when he was 9 months old. (R. 396.) Surgery on the right eye was only partly successful, and Plaintiff's eyesight in that eye continued to deteriorate. (R. 384). In December 2014, Plaintiff visited Cook County Health Systems complaining of redness and discharge from his right eye, as well as pain when he closed it. (R. 351-52.) He was initially diagnosed with conjunctivitis and urged to make an ophthalmology appointment. (*Id.*) After visiting the ophthalmologist in January and February

---

[4] Because we are remanding for reasons related solely to the ALJ's assessment of Plaintiff's physical impairments, we do not summarize the medical record with respect to Plaintiff's mental health evaluations except where relevant to our decision.

2

2015, Plaintiff experienced a detached retina in his right eye on May 19, 2015, and lost all sight in that eye as a result. (R. 43, 372, 387.) Plaintiff's left eye has near normal vision, assessed as 20/30 or 20/40 at various appointments. (R. 385, 396.)

While being treated for problems related to his detached retina, Plaintiff also had regular treatment for asthma and allergies. Between March 2014 and December 2015, Plaintiff had appointments approximately every three months with Byung Yu, M.D., at Cook County Health Systems. (R. 342-78.) Records from these visits reflect that Plaintiff's asthma was generally well-controlled with medication. (R. 342.) Plaintiff's allergies included atopic dermatitis, allergic rhinitis, uveitis[5] and food allergies, all of which primarily manifested as rashes on his skin and soreness and discharge on and around his eyes and eyelids. (R. 492.) He used a number of topical, inhaled, and ingested medications to treat his symptoms, and the medical record shows that the severity of his symptoms, including dry, burning and itchy skin, redness, watery eyes, sore and infected eyelids and coughing fluctuated from appointment to appointment. (*Id.* 343, 347-70.)

On July 27, 2015, Plaintiff was examined by Commission doctor Carolyn Hildreth, M.D. (R. 384.) She described his 2009 cataract surgery and right eye vision loss, and assessed him as blind in the right eye, with 20/40 vision in the left. (R. 393.) Dr. Hildreth also noted Plaintiff's history of asthma, and that he had not required emergency room visit or use of a nebulizer for the previous several years. (R. 387.)

On August 12, 2015, Plaintiff had an ophthalmology appointment with Zachary Seagrave, M.D., because of redness and discharge from his right eye. (R. 442.) Dr. Seagrave diagnosed

---

[5] Uveitis is a form of eye inflammation affecting the middle layer of tissue in the eye. https://www.mayoclinic.org/diseases-conditions/uveitis/symptoms-causes/syc-20378734. (Website visited on June 19, 2019.)

plaintiff with atopic dermatitis and severe MGD[6]; he increased one of Plaintiff's eye-drop dosages to every three hours and added a new ointment for dry areas on his skin. (R. 444.) That same day, plaintiff also had a dermatology appointment, which noted active atopic dermatitis on his arms and upper back, and an eye infection, which was being treated by the ophthalmology department. (R. 459-61.)

Plaintiff underwent an ophthalmology consultative examination on August 18, 2015. (R. 396.) David Hillman, M.D., noted that Plaintiff had been born with cataracts in both eyes, but that his vision did not begin to deteriorate until 2008, leading to his surgery in 2009. (*Id.*) Dr. Hillman found that Plaintiff could perceive light, but nothing else from his right eye, and that his left eye had 20/30 vision (*Id.*) On September 4, 2015, Plaintiff had an ophthalmology appointment to follow up on problems he was having with right eye redness and discharge. (R. 401-05.) Dr. Seagrave listed 19 different medications (topical, inhaled and ingested) that Plaintiff was currently prescribed to treat his asthma, allergies, and allergy-related eye problems. With respect to Plaintiff's eyes, Dr. Seagrave wrote that Plaintiff's redness and discharge in his right eye was "improved;" he noted plaintiff was being treated for "atopic dermatitis with severe blepharitis and dry eye."[7] (R. 401, 476.) At the time, Plaintiff was still using steroid eye drops four times per day as well as three other topical treatments as needed, and was also being treated by a dermatologist. (R. 401-04.)

On September 17, 2015, Myrtle Mason, M.D., M.P.H., performed a psychiatric examination on plaintiff for the Commission. (R. 409.) Plaintiff reported that his chief complaint

---

[6] MGD stands for meibomian gland dysfunction, and refers to a blockage of the gland that is supposed to secrete oil into the tear ducts. MGD is associated with dry eye and infections of the eyelid. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3772773/. Visited on June 19, 2019.

[7] Blepharitis is an inflammation of the eyelid. https://www.mayoclinic.org/diseases-conditions/blepharitis/symptoms-causes/syc-2037014. (Visited on June 17, 2019).

4

was loss of vision in his right eye, and that it was upsetting to have limited vision. (R. 410.) Dr. Mason noted that Plaintiff was bothered by feelings of insecurity, but her examination was mostly unremarkable. (R. 409-13). She diagnosed him with an adjustment disorder, NOS. (R. 413.)

Commission doctor Calixto Aquino, M.D., reviewed the medical record on October 15, 2015 and opined that plaintiff's only impairment was right-eye blindness. Because Plaintiff's left-eye vision was essentially normal, his vision overall was non-severe; thus Dr. Aquino opined that Plaintiff did not have a severe impairment. (R. 75.) Dr. Aquino also opined that Plaintiff's remaining impairments – cataracts, asthma, and affective disorder – were non-severe. (R. 76.) On reconsideration on January 10, 2016, Jerda Riley, M.D. explained that Plaintiff's eye impairment was non-severe because his left eye had nearly normal vision (20/30). Therefore, Dr. Riley opined that Plaintiff had a Residual Functional Capacity ("RFC"): to lift 50 pounds occasionally and 30 pounds frequently, and to avoid activities requiring even moderate exposure to operating moving vehicles, working at hazardous unprotected heights, and machines with open areas, conveyors, machines with blades or combustible parts, or machines with parts that can engage the body. (R. 84.)

Plaintiff continued to visit Cook County Health Systems monthly for follow-up appointments related to his eye problems and allergies; he often visited both the ophthalmology and dermatology departments on the same day.[8] On November 18, 2015, he had a follow-up dermatology appointment that noted improvement in his atopic dermatitis. (R. 521.) On December 1, 2015, Dr. Byung continued to prescribe multiple types of eye drops and topical ointments to be applied around Plaintiff's eyes and his skin throughout the day. (R. 535-55.) On March 4, 2016, Plaintiff had another check of his eyelids. Justin Bloomberg, D.O., noted that Plaintiff's right-eye

---

[8] Plaintiff saw a number of different doctors during his various appointments at Cook County Health Systems. We identify specific doctors only when relevant to our decision.

redness and discharge were improved; the doctor reiterated Plaintiff's diagnosis with severe MGD, blepharitis, and atopic dermatitis affecting his eyelids, as well as uveitis in his right eye. (R. 583-85.)

On March 14, 2016, James Moy, M.D., of Stroger Hospital, wrote a note that Plaintiff "is blind in one eye and has decreased vision in his other eye." (R. 764.) In an undated note, Dr. Bloomberg wrote that Plaintiff "has a history of chronic eye problems in the right eye arising from retinal detachment, as well as skin problems around the eye related to allergies, requiring multiple applications of medicines in the eye daily. The eye drains throughout the day, and will require him to give attention to his eyes frequently. However he is able to fully participate in unrestricted work and has normal visual function in his left eye." (R. 765.) In another undated note, Dr. Seagrave wrote that Plaintiff was being treated for atopic dermatitis with severe blepharitis and dry eye. (R. 766.) The note also states that at the time, Plaintiff was using a steroid eye drop four times per day, an ointment and an antibiotic, and that he had a very poor visual prognosis of the right eye. (*Id.*)

At an appointment on May 18, 2016, Plaintiff was temporarily prescribed a new topical ointment for a flare-up of atopic dermatitis on his face; he complained of swelling of his eyelids and red, itchy skin on his face. (R. 630-31.) He also continued to be prescribed four types of eyedrops to use between two and four times per day as well as a number of topical and inhaled medications. (R. 644-645.) By the time of Plaintiff's next appointment in June 2016, the flare-up was improved, but he had fissuring around his right lower eyelid and other skin rashes on his face and trunk. (R. 648-49.) On November 4, 2016, Plaintiff had an ophthalmology appointment with Dr. Bloomberg, who continued Plaintiff's regimen of four different prescriptions for eye drops, two applied twice per day, one applied four times per day, and one applied every three hours. (R. 416-17.)

On February 22, 2017, Plaintiff underwent a psychiatric evaluation by Mark Amdur, M.D., at the request of plaintiff's attorney. (R. 432.) Plaintiff denied having any problems with nerves, mental issues, learning issues, or behavioral problems. (R. 433). When asked a standard question designed to elicit obsessive-compulsive symptoms, Plaintiff stated that he had a habit of talking to himself when alone to help him remember things he may have forgotten; Dr. Amdur characterized this behavior as either "an obsessive or autistic feature." (*Id.*) Dr. Amdur also noted that plaintiff rubbed his face repeatedly during the examination. (*Id.*). Dr. Amdur noted that both Plaintiff and his mother attributed his limitations to his vision issues, but Dr. Amdur explained that he could not assess the severity of plaintiff's visual impairments. (*Id.*) Instead, Dr. Amdur identified cognitive and austism spectrum symptoms including blunted affect, inattentiveness, minimal socializing, poor hygiene and grooming, illogicality, comprehension problems and visuospatial problems, in addition to plaintiff's habit of talking to himself. (*Id.*)

### B. Educational History

Plaintiff graduated from high school in 2007. (R. 37.) He received special education services beginning in the first grade, although the record contains information only about his educational history for the 10th through 12th grades. (*Id.*) Starting in the 10th grade, Plaintiff received special education services because of learning disabilities; 60 percent to 80 percent of Plaintiff's special education services were provided within the regular classroom. (R. 260, 269.) Notes from Plaintiff's high school individualized education plan ("IEP") describe him as conscientious and respectful, and they note that his teachers were pleased with his academic and social progress. (R. 283.)

In 2008, Plaintiff completed a certificate in pharmacy tech from Everest College. (R. 758, 770.) Between 2007 and 2010 he worked as in materials management and then as a pharmacy

technician, first at a Walgreens and then at Provident Hospital; he was unable to continue working in this job after his eyesight deteriorated. (R. 54, 755.)[9] He last worked in 2010. (*Id.*) From December 2016 to December 2017, Plaintiff worked with a counselor from the Illinois Department of Human Services to try to find a job. (R. 421-24). In explaining Plaintiff's work limitations, his counselor described him as blind in one eye and needing safe work conditions away from pollen, mold, dust, stress, carpeted areas or pets, and also that he needed extended time to complete work and learned best through visual aids. (R. 425.) Notes from Plaintiff's initial interview with the Illinois Division of Rehabilitation Services stated that his employment goal was to work part-time as a pharmacy tech. (R. 771.) The record does not reflect that Plaintiff ever worked as a result of his participation in the work rehabilitation program.

C.     **Hearing Testimony**

At the hearing, Plaintiff testified that he earned a pharmacy technician certificate from Everest College in 2008, but that he has been unable to find work in that field because of his right-eye blindness. (R. 36, 40.) He testified that he requested that his rehabilitation counselor look for part-time work because he did not want to put too much stress on his left eye. (R. 51.) With respect to his eyes, Plaintiff testified that his allergies caused both eyes to tear up, particularly, but not solely, after reading "for a while." (R. 42, 51.)[10] After using his eyes for around two to two-and-one-half hours, Plaintiff testified that his left eye would start to hurt and that he must stop and care for both eyes, and then rest his left eye for 90 minutes after that. (R. 50, 56-57.)

---

[9] At least part of plaintiff's work between 2007 and 2010 occurred through a school-sponsored program for students with certain medical and other impairments. (R. 49, 58.)

[10] Elsewhere in his testimony, Plaintiff stated that his left eye began to hurt after using it for too long, without qualifying that use as being limited to reading. (R. 50.)

8

Plaintiff experiences daily redness and discharge from his right eye; he must care for it multiple times per day, including cleaning it with warm compresses and putting in eye drops (R. 219.). He uses a steroid eye drop three times per day and another eye drop as needed (*Id.*, 221.)

The ALJ gave the vocational expert ("VE") a number of hypotheticals which accounted for Plaintiff's right-eye blindness, asthma, and allergies.[11] (R. 65.) The VE identified several jobs plaintiff could perform, such as dining room attendant, industrial cleaner and sales attendant. (R. 66-67). The ALJ's second hypothetical added the limitation that the individual would only complete 80 to 85 percent of the work tasks in a given day because they work at a slower pace or are otherwise off-task; the VE testified that being off-task any more than 15 percent of the time would preclude all work options. (R. 67.) The third hypothetical is not relevant to our analysis, and in responding to the fourth hypothetical, the VE testified that all work would be precluded for an individual who needed daily redirection back to task or re-demonstration of work tasks. (R. 68.)

### D. ALJ Opinion

In her opinion, the ALJ followed the familiar, five-step process for assessing a disability claim. At Step One, she determined that Plaintiff had not engaged in substantial, gainful activity since his onset date. (R. 15). At Step Two, she determined that Plaintiff had the severe impairments of "history of congenital cataracts, status post-removal (2009); right-eye dry eye with blepharitis;

---

[11] The ALJ's initial hypothetical eventually became her assessment of Plaintiff's RFC. It included: being able to perform medium work, subject to no more than frequent balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; should never climb ladders, ropes, or scaffolds; should never perform work tasks involving extraordinary hazards such as unprotected heights, and dangerous, unguarded moving mechanical parts with open areas that can engage body parts of the individual or others or with exposed blades or combustible parts; can avoid ordinary workplace hazards such as boxes on the floor, doors ajar, and approaching persons, but should not work in an environment where exposed to operating moving motor vehicles; can frequently read, including typewritten and small print; can see to constantly work with small, medium, and large objects; never work involving concentrated vibration; never work in temperature extremes, or in environments with exposure to concentrated amounts of pulmonary irritants, such as dusts, fumes, odors, gases, and poor ventilation; can understand, remember and carry out on a sustained basis simple and detailed but not complex work tasks, but may require that tasks be demonstrated; can never perform fast-paced production line tasks that are timed, but can perform goal-oriented work. (R. 65-66).

uveitis; retinal detachment; blindness with atopic dermatitis; cognitive impairment (visual learning); and adjustment disorder." (*Id.*)

At Step Three, the ALJ determined that Plaintiff did not have a listed impairment. (R. 16.)[12] Specifically, Plaintiff's vision in his left eye was good enough to preclude him meeting a listing for blindness, and plaintiff's mental impairments did not meet a listing based on the ALJ's analysis of the "Paragraph B" criteria. (R. 17.)[13] The ALJ found Plaintiff's primary limitation to be related to his right-eye blindness, and not any mental impairment. (*Id.*).

Before Step Four, the ALJ set Plaintiff's RFC as being able to perform medium work, subject to no more than frequent balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; should never climb ladders, ropes, or scaffolds; should never perform work tasks involving extraordinary hazards such as unprotected heights, and dangerous, unguarded moving mechanical parts with open areas that can engage body parts of the individual or others or with exposed blades or combustible parts; can avoid ordinary workplace hazards such as boxes on the floor, doors ajar, and approaching persons, but should not work in an environment where exposed to operating moving motor vehicles; can frequently read, including typewritten and small print; can see to constantly work with small, medium, and large objects; never work involving

---

[12] The "listings" in the Social Security regulations specify the criteria for those impairments considered presumptively disabling. *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1150 (7th Cir. 2019) (citing 20 C.F.R. § 404.1525(a)).

[13] "Paragraph B" provides the functional criteria for determining whether an individual is disabled under the listings for mental disorders. *See* Listing 12.00A(2). To satisfy the Paragraph B criteria (and thus demonstrate an individual is disabled), a mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. "Paragraph C" provides the criteria for evaluating "serious and persistent mental disorders," an alternative to the Paragraph B criteria for proving disability. Listing 12.00G. To satisfy the paragraph C criteria, a mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least two years, and evidence that shows that the individual relies, on an ongoing basis, upon medical treatment and/or mental health therapy to diminish the symptoms and signs of the mental disorder, but that despite the diminished symptoms and signs, the individual has achieved only marginal adjustment, meaning she has minimal capacity to adapt to changes in her environment. *Id.*

10

concentrated vibration; never work in temperature extremes, or in environments with exposure to concentrated amounts of pulmonary irritants, such as dusts, fumes, odors, gases, and poor ventilation; can understand, remember and carry out on a sustained basis simple and detailed but not complex work tasks, but may require that tasks be demonstrated; can never perform fast-paced production line tasks that are timed, but can perform goal-oriented work. (R. 17-18.)

At Step Four, the ALJ found that Plaintiff had no past relevant work, and Step Five, she found that there were jobs in the national economy that existed in significant numbers that the Plaintiff could perform. (*Id.*)

In coming to her conclusion about Plaintiff's RFC, the ALJ described Plaintiff's allegations about his impairments as including general difficulty with seeing, memory, completing tasks, concentration, understanding, and following instructions. (R. 18.) She also noted that Plaintiff reported needing people to repeat themselves, that he has some difficulty socializing, and that while he could read fine print with his left eye, reading too long would cause eye strain and require him to rest his eye for more than an hour. (*Id.*) After considering these allegations and the evidence, the ALJ concluded that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 18.)

With respect to Plaintiff's allegations about his eyes, the ALJ stated that Plaintiff had right-eye problems with redness and discharge on an intermittent basis, caused by atopic dermatitis, a condition that flared up at times but "overall remained largely unchanged." (R. 19.) Moreover, the ALJ stated that, while Plaintiff sometimes appeared with reddened and thickened eyelids, his condition in 2016 was, if anything, improving. (*Id.*)

As for opinion evidence related to Plaintiff's eyes, the ALJ gave great weight to Dr. Bloomberg's opinion that despite his chronic eye and allergy problems, Plaintiff was able to "participate in unrestricted work with normal vision in his left eye." (R. 20.) In support, the ALJ pointed to Plaintiff's near-perfect vision in his left eye and his ability to take his medication, read the newspaper, play instruments, and perform personal-care tasks. (*Id.*) The ALJ noted that she added a limitation on reading to account for eye strain and other postural and environmental limitations to accommodate Plaintiff's right-eye blindness. (*Id.*)

The ALJ gave substantial weight to the opinion of the state agency medical consultant who opined that Plaintiff could perform medium work with additional postural, visual, and environmental limitations because "the physical limitations opined are generally supported by the record as a whole." (R. 21.) The ALJ did acknowledge getting new evidence at the hearing level, but she found Plaintiff's condition to be largely unchanged. (*Id.*). With respect to Plaintiff's asthma and allergies, the ALJ noted that Plaintiff's symptoms were largely controlled. The ALJ included limitations in the RFC to accommodate those impairments, such as the requirement that Plaintiff not work around dust and other irritants. (R. 20.) She also added a reading limitation to account for Plaintiff's report of eye strain. (*Id.*)

## II. Analysis

### A. Standard of Review

"We will review the ALJ's decision deferentially and will affirm if it is supported by substantial evidence." *Decker v. Colvin*, No. 13 C 1732, 2014 WL 6612886 at *9 (N.D. Ill. Nov. 18, 2014). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480 at *4 (N.D. Ill. May 6, 2015). The Court will not reweigh evidence or substitute its own judgment for

that of the ALJ. *Decker* 2014 WL 6612886 at *9. In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Id., quoting Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005). Instead, the Court must be able to trace the ALJ's reasoning from the evidence to the result. *Minnick v. Colvin,* 775 F.3d 929, 938 (7th Cir. 2015).

Plaintiff argues that the ALJ erred in finding him not disabled because: (1) the ALJ's RFC determination does not adequately account for either his visual impairment or his mental impairment, and (2) the ALJ erred in discounting Dr. Amdur's opinion and diagnosis. (Pl. Mem. in Support at 6.) Because we remand based on the ALJ's treatment of Plaintiff's visual impairment, we do not reach his other assignments of error.

## B. The RFC

The RFC is an assessment of what work-related activities a claimant can perform despite his limitations. *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1); 416.1545(a)(1). The ALJ must determine an individual's RFC, based upon medical evidence as well as "other evidence, such as testimony by the claimant or his friends and family." *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008). That is, in evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3). Moreover, in making an RFC determination, the ALJ must consider and account for all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment. 20 C.F.R. § 404.1523; *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir.2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009).

The Court will uphold ALJ decisions if the evidence supports them, and if the ALJs explain their analysis of the evidence with enough detail and clarity to permit meaningful review. *Eichstadt v. Astrue,* 534 F.3d 663, 665–66 (7th Cir. 2008). Although an ALJ need not mention every snippet of evidence in the record, ALJs must connect the evidence to the conclusion; in so doing, they may not ignore entire lines of contrary evidence. *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir.2010). Furthermore, an ALJ must analyze a claimant's impairments – both severe and non-severe – in combination. *Terry,* 580 F.3d at 477.

## C. The ALJ's RFC Determination

The ALJ's RFC determination did not account for all of Plaintiff's impairments. The ALJ found that Plaintiff had seven severe impairments, five of which related either to his retinal detachment/right-eye blindness or other eye problems, including blepharitis, blindness-related atopic dermatitis, and uveitis, which were caused by his allergies. In finding that Plaintiff could perform work pursuant to the RFC assessed by the ALJ, the ALJ relied primarily on evidence that Plaintiff had normal vision in his left eye, and on the general statements that Plaintiff's right-eye discharge and redness caused by atopic dermatitis were generally unchanged or improving. This explanation does not go nearly far enough in creating the required "logical and accurate bridge" from the evidence to the ALJ's conclusion.

### 1. Severe eye impairments

The impairments of blepharitis, atopic dermatitis and uveitis and the symptoms they caused were separate from Plaintiff's right-eye blindness due to his detached retina. The ALJ found them to be severe impairments, and yet, did not address whether or how these impairments might affect Plaintiff's ability to work or his RFC. Specifically, the ALJ's RFC and her opinion do not account for any of the evidence that Plaintiff's allergy-related eye impairments caused additional

14

workplace limitations, such as time spent off-task to care for his eyes with medication or to rest his eyes from strain. The medical record is replete with evidence that Plaintiff's atopic dermatitis and blepharitis required near daily (and sometimes near hourly) care, to the extent that he was prescribed at least three different topical eye drops and ointments to be applied at numerous and varied times per day. One of the drops needed to be applied every three hours, while another needed to be taken four times per day, and other was used "as needed." Additionally, Plaintiff testified that he had to care for his right eye throughout the day by using eye drops and ointment and by putting a wet compress on it. He also testified that after using his left eye for several hours, it would begin to hurt, and he would need to rest it for up to 90 minutes.

In his motion for summary judgment, Defendant responds that there is no evidence that the time Plaintiff needs to tend to his eyes would rise to the level of causing him to be off-task for more than fifteen percent of the work day. (Def. Mot. for Sum. J. at 4-5). This is not strictly accurate, because Plaintiff testified not only to having to put various medications in his right eye throughout the day, but also that due to eye strain in his left eye, he might need to be off-task for up to 90 minutes after working for two to three hours.[14] In any event, we do not make any determination of how much time Plaintiff would be off-task due to a combination of the need to care for his right eye and the need to rest his left eye. Instead, the reason for our remand is that the

---

[14] The ALJ's RFC has an additional problem related to Plaintiff's left-eye strain; the ALJ doesn't explain why her RFC allowed Plaintiff to "frequently read" including small print, despite plaintiff's uncontradicted evidence that he was only able to use his eyes for a maximum of two-and-one-half hours before needing to rest his left eye for 90 minutes, and the ALJ's own statement that she limited plaintiff's reading to account for his eye strain. The social security regulations define "frequent" use as up to six hours in an eight-hour work day, which is well-beyond Plaintiff's stated ability to use his left eye before needing a significant rest. SSR 83-10. Again, while the ALJ is entitled to find that Plaintiff's limitations are not as severe as he alleges, she must sufficiently support her RFC so that we may trace her reasoning from the evidence to her opinion. *See, Young v. Barnhart*, 352 F.3d 995, 1002 (7th Cir. 2004) (remanding case where RFC failed to account for evidence in the record concerning all of plaintiff's impairments.)

ALJ does not adequately address what work limitations, if any, Plaintiff has because of the symptoms that arise from his eye-related allergy impairments, which the ALJ found to be severe.

Of course, the ALJ was entitled to determine that Plaintiff's blepharitis, atopic dermatitis, and uveitis did not, on their own or in combination with Plaintiff's other impairments, render him unable to work. But the law requires ALJs to explain their reasoning adequately, based on the record evidence. ALJs are not allowed to "cherry pick" the evidence they use to support their conclusion, ignoring any evidence that undermines that conclusion. *Spicher v. Berryhill,* 898 F.3d 754, 757 (7th Cir. 2018) (ALJs may not ignore evidence that undercuts their conclusions). In this case, the ALJ does not build a logical bridge between evidence of the symptoms and limitations caused by Plaintiff's allergy-related eye issues and the ALJ's determination that Plaintiff was not disabled, and thus, we cannot determine whether the ALJ considered them before rendering her RFC assessment. Moreover, her comment that Plaintiff's allergy-related eye and skin conditions were unchanged or possibly improving does not explain adequately how the ALJ found that Plaintiff's eye conditions as they existed were not severe enough to render him disabled. *Murphy v. Colvin,* 759 F.3d 811, 819 (7th Cir. 2014) (condition characterized as "stable" or "improving" does not necessarily mean claimant can perform work at a particular level).

### 2. Doctors' opinions

The opinion evidence the ALJ relied on to support her RFC is insufficient to overcome these defects. She gave significant weight to two opinions regarding Plaintiff's eye impairments, one from Dr. Bloomberg and one from the state agency medical consultants. Neither opinion, nor the ALJ's treatment of them, sufficiently addresses whether Plaintiff's allergy-related eye impairments cause limitations on his ability to work.

Even assuming that the ALJ properly gave Dr. Bloomberg's undated letter controlling weight for the issue of Plaintiff's right-eye blindness, the opinion does not address adequately whether Plaintiff has any limitations from his allergy-related eye impairments. Although Dr. Bloomberg stated that Plaintiff may participate in unrestricted work, the opinion's reference to Plaintiff's normal vision in his left eye suggests that Dr. Bloomberg is referring strictly to Plaintiff's ability to perform the tasks required of a job despite his right-eye blindness, not whether his need to tend to his right eye throughout the day creates additional limitations on his ability to work. And, even accepting that Dr. Bloomberg's opinion can be interpreted fairly as clearing Plaintiff for unrestricted work despite his right-eye redness and discharge, that opinion does not address whether Plaintiff's need to stop work to attend to his eye throughout the day is a limitation that the ALJ should have included in his RFC. Indeed, Dr. Bloomberg's recognition that Plaintiff has a frequent need to attend to his right eye and that he must apply medications to the area around his eye multiple times per day, if anything, highlights the ALJ's not having accounted for the time Plaintiff needs to attend to his eye and the ALJ's not having adequately considered whether such time off-task would rise to the level of rendering him disabled.

The state agency doctor's opinion does not mention Plaintiff's allergy-related eye impairments at all. Dr. Riley opined only that Plaintiff's eye impairment was non-severe because Plaintiff had normal vision in his left eye, and Dr. Riley's RFC opinion thus accounts only for his right-eye blindness. Yet the ALJ found that Plaintiff's right-eye vision loss and his allergy-related eye impairments both were severe. As explained above, while the ALJ is entitled to find that severe impairments do not limit a claimant's ability to perform work, the ALJ must minimally articulate her reasoning for making such a determination. Even assuming that Dr. Riley's opinion was correct with respect to Plaintiff's right-eye blindness, that opinion does not support or explain

the ALJ's failure to address Plaintiff's allergy-related impairments and what additional limitations those impairments may cause.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (D.E. 16) is granted. We remand the case for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: July 15, 2019**